James F. Clapp, Esq., SBN 145814
DOSTART CLAPP GORDON & COVENEY
4370 La Jolla Village Drive, Suite 970
San Diego, CA 92122
Telephone: (858) 623-4200
Facsimile: (858) 623-4299
jclapp@sdlaw.com

Kevin J. McInerney, Esq., SBN 46941
Charles A. Jones, Esq., SBN 224915
MCINERNEY & JONES
18124 Wedge Parkway #503
Reno, NV 89511
Telephone: (775) 849-3811
Facsimile: (775) 849-3866
kevin@mcinerneylaw.net
kelly@mcinerneylaw.net
caj@mcinerneylaw.net

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**LINDA YOUNG, MIKE SAFAIE,** and **JANICE KEVARI,** individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**CHARLES SCHWAB & CO., INC.**

Defendant.

Case No. C 07:2828 CW

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**

Date: August 21, 2008
Time: 2:00 p.m.
Place: Courtroom 2
Judge: Hon. Claudia Wilken

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. PROCEDURAL BACKGROUND ..... 2

III. SETTLEMENT AND PRELIMINARY APPROVAL ..... 3

A. The Settlement ..... 3

B. Notice To The Class ..... 4

C. Exclusions ..... 4

D. Irregular Claims ..... 4

E. Objections ..... 5

IV. THE COURT SHOULD GIVE FINAL APPROVAL TO THE SETTLEMENT ..... 5

A. Standard For Approval. ..... 5

B. The Settlement is Entitled to a Presumption of Fairness ..... 6

C. The Settlement is Fair Under the *Hanlon* Criteria ..... 7

VI. CONCLUSION ..... 13

# TABLE OF AUTHORITIES

## CASES

*7-Eleven Owners for Fair Franchising v. Southland Corp.*,
85 Cal. App. 4th 1135(2000)........................................ 6

*Church v. Consolidated Freightways, Inc.*,
C-91-4168-DLJ, C-90-2290-DLJ, 1993 WL 149840 (N.D. Cal. May 3, 1993)........ 5

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992)........................................ 5

*Dunk v. Ford Motor Co.*,
48 Cal. App. 4th 1794 (1996)........................................ 6

*Ellis v. Naval Air Rework Facility*,
87 F.R.D. 15 (N.D. Cal. 1980)........................................ 6

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)........................................ 7

*Hein v. PNC Financial Services Group, Inc.*,
511 F. Supp. 2d 563 (E.D. Pa. 2007)........................................ 9

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
720 F. Supp. 1379 (D. Ariz. 1989)........................................ 5, 6

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998)........................................ 6

*Miller v. Farmers Insurance Exchange*,
481 F.3d 1119 (9th Cir. 2007)........................................ 8

*Officers for Justice v. Civil Serv. Comm'n*,
688 F.2d 615 (9th Cir. 1982)........................................ 5

*Van Bronkhorst v. Safeco Corp.*,
529 F.2d 943 (9th Cir. 1976)........................................ 5

# TABLE OF AUTHORITIES
(continued)

## STATUTES/REGULATIONS

28 U.S.C. §1715 (2005) .......... 4

Fed. R. Civ. Proc. 23 (2007) .......... 5

## OTHER AUTHORITIES

DOL Opinion Letter FLSA 2002 .......... 8

## TREATISES

4 NEWBERG ON CLASS ACTIONS § 11.41 .......... 5

MANUAL FOR COMPLEX LITIGATION, FOURTH (Fed. Judicial Center 2004) ("MANUAL"), §§ 21.6 *et seq.* .......... 5

## I.    INTRODUCTION

Plaintiffs Linda Young, Mike Safaie, and Janice Kevari (collectively, "Plaintiffs" or "Class Representatives") hereby move this Court for final approval of their proposed $2.125 million, non-reversionary class action settlement ("Settlement").  If approved by the Court, the Settlement would resolve all claims based on allegations that Schwab failed to pay overtime wages under state and federal law to Plaintiffs and other Client Service Specialists (collectively, "CSSs" or "Class Members" or "the Class").

The Court granted preliminary approval of the Settlement on April 2, 2008.  On May 2, 2008, the claims administrator, Rust Consulting, mailed the Court-approved notice of the Settlement to the 852 putative Class Members.  As directed by the Preliminary Approval Order, Rust will be filing a detailed declaration regarding the notice and claims process approximately on week prior to the final approval hearing (currently set for August 21, 2008).  Because the claims period runs through July 31, 2008, the figures regarding claims to date as described in this motion will change to some minor degree.  The period for filing objections and/or exclusions has run.

The proposed settlement allocates the net settlement proceeds into two funds.  Persons who worked for Schwab in the covered positions prior to October 1, 2005 can claim based upon the number of weeks they worked in the covered period and based upon the state in which they were employed.  This Court has adopted the allocation findings of Retired Judge Charles Legge, who served as Special Master, which findings stated that employees in California should receive twice the settlement amount per week as those employed outside California.

As of July 10, 2008, 48% of the persons eligible to claim against this sub-fund had submitted claims accounting for approximately 61% of the total work weeks for that period.  Since this settlement is non-reversionary, those who do submit timely claims are expected to receive considerably more than the minimum amount suggested by the class notice.  That notice was premised on an assumption that all or virtually all eligible putative class members would submit claims and provided an estimate of $50 per work week for California employees and $25 per work week for those employed outside of California.

## I.    INTRODUCTION

Plaintiffs Linda Young, Mike Safaie, and Janice Kevari (collectively, "Plaintiffs" or "Class Representatives") hereby move this Court for final approval of their proposed $2.125 million, non-reversionary class action settlement ("Settlement"). If approved by the Court, the Settlement would resolve all claims based on allegations that Schwab failed to pay overtime wages under state and federal law to Plaintiffs and other Client Service Specialists (collectively, "CSSs" or "Class Members" or "the Class").

The Court granted preliminary approval of the Settlement on April 2, 2008. On May 2, 2008, the claims administrator, Rust Consulting, mailed the Court-approved notice of the Settlement to the 852 putative Class Members. As directed by the Preliminary Approval Order, Rust will be filing a detailed declaration regarding the notice and claims process approximately on week prior to the final approval hearing (currently set for August 21, 2008). Because the claims period runs through July 31, 2008, the figures regarding claims to date as described in this motion will change to some minor degree. The period for filing objections and/or exclusions has run.

The proposed settlement allocates the net settlement proceeds into two funds. Persons who worked for Schwab in the covered positions prior to October 1, 2005 can claim based upon the number of weeks they worked in the covered period and based upon the state in which they were employed. This Court has adopted the allocation findings of Retired Judge Charles Legge, who served as Special Master, which findings stated that employees in California should receive twice the settlement amount per week as those employed outside California.

As of July 10, 2008, 48% of the persons eligible to claim against this sub-fund had submitted claims accounting for approximately 61% of the total work weeks for that period. Since this settlement is non-reversionary, those who do submit timely claims are expected to receive considerably more than the minimum amount suggested by the class notice. That notice was premised on an assumption that all or virtually all eligible putative class members would submit claims and provided an estimate of $50 per work week for California employees and $25 per work week for those employed outside of California.

The second sub-fund is an amount of $275,000 that will be distributed uniformly for all persons who worked for Schwab after October 1, 2005, the point when Schwab reclassified all its CSSs as non-exempt. As of July 10, 2008, approximately 310 had submitted claims against this sub-fund. At that level of response, each claimant would receive approximately $850 from this sub-fund.

No class member has filed an objection to this Settlement. Moreover, out of the 852 putative class members, only twenty-one have filed an exclusion request. This is equivalent to 2.46% of the putative class. As discussed below, the Settlement is entitled to a presumption of fairness, since it was reached through arm's-length negotiations between experienced and fully-informed counsel, with the assistance of a highly-qualified mediator. Furthermore, the Settlement satisfies the criteria for final approval established by the Ninth Circuit in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998). Accordingly, the Parties respectfully request that the Court grant this Motion.

## II. PROCEDURAL BACKGROUND

The initial complaint in this action was filed on May 31, 2007 on behalf of Linda Young and others similarly situated. It alleged that Schwab had failed to pay overtime as required by the FLSA. The complaint was amended on August 3, 2007 to add a California sub-class. At this juncture, Michael Safaie became a second named plaintiff and alleged violations of the California Labor Code and Business and Professions Code §17200. It was then discovered that another class lawsuit had been filed by one Janice Kevari in the San Francisco Superior Court. This complaint also alleged violations of the California labor laws and Ms. Kevari was represented by the law offices of Scott Cole, Esq. Counsel for Young and Safaie contacted Mr. Cole and it was agreed that Janice Kevari would join the Young/Safaie action as a named plaintiff and would dismiss her San Francisco Superior Court case.

In November of 2007, the parties participated in a day-long mediation before David Rotman, Esq. As this Court is undoubtedly aware, David Rotman has mediated literally dozens of overtime class actions. While a settlement was not finalized that day, the parties

continued to discuss resolution and an agreement in principle was reached approximately two weeks later. The parties agreed to seek the services of Retired Judge Charles A. Legge regarding the allocation of settlement proceeds between California and non-California workers. On April 2, 2008, this Court entered an order appointing Judge Legge as a Special Master and later adopted Judge Legge's findings with respect to a two to one allocation in favor of California workers. On April 2, 2008, this Court granted preliminary approval to the proposed Settlement.

## III. SETTLEMENT AND PRELIMINARY APPROVAL

### A. The Settlement

In November 2007, the Parties engaged in a full-day private mediation with well-respected mediator, David Rotman, Esq. Although the Parties did not reach a settlement on that date, they continued to engage in settlement discussions and within a few weeks, with the continued assistance of David Rotman, the Parties reached an agreement in principle to settle this action on the terms for which they are now seeking final approval. This Settlement was the product of protracted arm's-length negotiations. Plaintiffs and the absent Class Members were represented by law firms with significant class action wage and hour experience. *See* McInerney Decl., at ¶ 4-11; Clapp Decl. at ¶2, 3.

On April 6, 2007, the Court appointed the Honorable Charles A. Legge, a retired federal Judge who is currently a mediator and arbitrator with JAMS in San Francisco, as a Rule 53 Special Master. *See* Order Appointing The Honorable Charles A. Legge as Master ("Order Appointing Judge Legge"), Docket No. 30. The Court appointed Judge Legge to determine whether the Settlement distribution formula proposed by the Parties for compensating Class Members is fair, adequate, and reasonable. *Id.* at 4-5. The Parties proposed a settlement allocation formula that was based on the number of months worked by each Class Member and valued the months worked in California at two times the value of the months worked outside of California. Judge Legge reviewed the briefs and supporting materials submitted by the Parties and held a hearing regarding the allocation formula. *See* Report, Findings and Recommendations of The Master ("Master's Report"), Docket No. 32. On February 22, 2008 Judge Legge issued a

detailed, written opinion concerning his findings. *Id.* Judge Legge ultimately concluded that California's wage and hour laws are more favorable to plaintiffs than the laws of other states, justifying a greater allocation of the Settlement to California Class Members. Judge Legge recommended that the Court approve as fair, reasonable, and adequate the proposed allocation formula.

**B. Notice To The Class**

The Preliminary Approval Order appointed Rust Consulting ("Rust") as the Claims Administrator, and directed Rust to send to the Class the following documents ("Notice Packet"): the Notice of Pendency and Opportunity to Opt-In, Proposed Settlement, and Hearing Date For Court Approval; Consent to Join Settlement Form; Claim Form; and Request for Exclusion Form. *See* Preliminary Approval Order, at 1. Defense counsel sent a copy of the Notice Packet and a complete list of the Class Members to the U.S. Attorney General and the appropriate state official in each of the jurisdictions in which a Class Member resides, in compliance with the requirements of CAFA, 28 U.S.C. §1715 (2005). No officials elected to respond. Defense counsel will submit a separate declaration regarding the CAFA compliance.

On May 2, 2008, Rust sent Notice Packets to each of the 852 Class Members by first-class mail. On June 24, 2008, Rust mailed a postcard to all Class Members who had not yet filed a Claim Form, advising them that July 31, 2008 was the claim filing deadline.

**C. Exclusions**

Rust has received only twenty-one (21) Exclusion Forms. Accordingly, only 2.46% of the potential Class timely elected to exclude themselves from the Settlement.

**D. Irregular Claims**

As in any class action settlement, Rust has received a small number of Claim Forms disputing the number of weeks worked by a particular employee, as well as Claim Forms raising other issues. However, the total number of these Claim Forms is relatively small, and the Parties are confident that all disputes and other open issues will be resolved before the final approval hearing.

**E. Objections**

The last date to file objections to the settlement was July 1, 2008. No class member has objected to the proposed Settlement.

## IV. THE COURT SHOULD GIVE FINAL APPROVAL TO THE SETTLEMENT

**A. Standard For Approval.**[1]

On a motion for final approval of a class action settlement under Federal Rules of Civil Procedure 23(e) (2007), the court must determine whether the settlement is "fair, adequate and reasonable." *See Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). A settlement is fair, adequate, and reasonable, and therefore merits final approval, when "the interests of the class are better served by the settlement than by further litigation." *See* MANUAL FOR COMPLEX LITIGATION, FOURTH (Fed. Judicial Center 2004) ("MANUAL"), §§ 21.6 *et seq*. at 309.

The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigors of formal litigation. *See* 4 NEWBERG ON CLASS ACTIONS § 11.41 (1992 & Supp. 2002) (and cases cited); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943 (9th Cir. 1976).

Although courts have "broad discretion" in determining that a proposed class action settlement is fair, the court's role "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *See Officers for Justice*, 688 F.2d at 625 (internal quotation marks and citation omitted). Accordingly, courts should give due regard to what is otherwise a "private consensual agreement" between the parties. *See Id.*; *Church v. Consolidated Freightways, Inc.*, No. C-91-4168-DLJ, C-90-2290-DLJ, 1993 WL 149840 (N.D. Cal. May 3, 1993); *In re Wash.*

[1] The standards for approving class action settlements under Rule 23 and collective action settlement under the FLSA are slightly different. Nevertheless, because the Rule 23 standards are more stringent, this Motion focuses on those standards.

*Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1387 (D. Ariz. 1989), *aff'd sub nom.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992); MANUAL § 21.61, at 309 ("The judicial role in reviewing a proposed settlement is critical, but limited to approving the proposed settlement, disapproving it, or imposing conditions on it. The judge cannot rewrite the agreement."). A court's approval of a class action settlement will only be reversed for a clear abuse of discretion. *See Officers for Justice*, 688 F.2d at 626 ("[W]e reverse only upon a strong showing that the district court's decision was a clear abuse of discretion"); *City of Seattle*, 955 F.2d at 1276; *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998).

In assessing the fairness of a settlement, the Court should weigh the following factors: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

**B. The Settlement Is Entitled to a Presumption of Fairness.**

The Court should begin its analysis with a presumption that the Settlement is fair and should be approved:

> [A] presumption of fairness exists where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small.

*Dunk v. Ford Motor Co.*, 48 Cal. App. 4th 1794, 1802 (1996); *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135, 1146 (2000); *accord Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *see In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. at 1387.

This Settlement satisfies all four factors. First, the Settlement was reached only after extensive arm's-length negotiations with the assistance of a well-respected mediator. The Parties engaged in a full day of mediation and continued to engage in Settlement discussions for a period of almost two weeks, until they finally reached a Settlement. Second, extensive investigation, discussion and substantial informal discovery fully informed Class Counsel about the case, so they unquestionably were able to understand its strengths and weaknesses. Third, Class Counsel are highly experienced in this type of litigation. *See* McInerney Decl., at ¶4-11; Clapp Decl. at ¶2, 3. Thus, the Settlement is presumptively fair.

**C. The Settlement Is Fair Under the *Hanlon* Criteria.**

As noted above, in *Hanlon*, the Ninth Circuit set forth several factors that a district court should consider in evaluating the fairness of a class action settlement. Each of the *Hanlon* factors warrants approval of the Settlement.[2]

Turning to the factors that the Ninth Circuit requires district courts to balance in assessing a settlement proposal, the strength of the plaintiffs' case is the first factor. *Hanlon v. Chrysler Corporation* 150 F3d. 1011 (9th Cir. 1998). When the broker cases were first started nearly four years ago, the idea that security brokers were entitled to overtime struck most people as unusual to say the least. For nearly six decades stockbrokers had been treated as exempt and people simply assumed that they were exempt. Their challenge to exempt status was based on a very sophisticated interplay of the regulations relating to exemptions for administrative employees. There was never any real issue that the brokerage employees routinely worked in excess of forty hours per week, although there were obviously differences between the work hours of individuals within a company and even some variations between brokers who worked for traditional wirehouses like Merrill Lynch, Smith Barney, and UBS and those who worked in-house for banks.

[2] There is no government participant in this case, however, the U.S. Attorney General and officials in all applicable states were informed of the Settlement and none has objected or otherwise responded to notice of Settlement.

It was certainly apparent to all counsel involved in this case that any decision could be appealed all the way up the appellate ladder so the likely duration factor favored settlement. Similarly, the expense of fully litigating a case like this would easily run into seven figures because of the number of potential depositions that would have to be taken all across the country of class representatives, class members, and supervisory and management personnel. The risk and complexity factors also favor settlement. One can get a feel for how complex the issues are in a case like this by simply glancing through Judge Houston's order denying summary judgment in one of these actions. *Takacs v. A.G. Edwards & Sons, Inc.* 444 F. Supp.2d 1100 (S.D. Cal. 2006).

There was always a very real risk factor in the stockbroker cases. Apart from their novelty, the attorneys who originally filed these cases were all extremely experienced wage and hour attorneys who also had very considerable class action experience. However, it was always discussed between us that, if the genre of litigation did prove successful, it would attract copycat suits and those might be filed by less skilled practitioners. A number of defense attorney likened our initial complaints to houses of cards. It could be better analogized to a minefield. If a plaintiffs' lawyer made a slight mischaracterization of the compensation schemes of the defendant or the duties performed, the plaintiffs' case would be blown away.

Another very real risk in the broker cases was that the US Department of Labor could issue an adverse opinion letter. For example, one may look to the impact of the November 2002 Opinion Letter from the DOL supporting the premise that insurance adjusters were administratively exempt. It was resoundingly criticized by the California Court of Appeals in *Bell v. Farmers Insurance Exchange* (2004) 115 Cal.App.4th 715, 733-35. Nonetheless, that Opinion Letter did gain some traction with some courts and wound up being cited with approval by the Ninth Circuit in *Miller v. Farmers Insurance Exchange*, 481 F.3d 1119, 1128-29 (9th Cir. 2007).

There was also an appreciable risk with respect to obtaining class action status, let alone maintaining it throughout trial. The defendant had plausible arguments that its Client Service Specialists performed a wide range of duties and did not approach their employment in

lockstep. Plaintiffs' counsel certainly recognized that there were differences in the amount of selling done by specialists and even by the same specialists depending on their tenure. This made class certification an interesting proposition. In hindsight we know that, more recently, at least two broker cases have been denied class certification. On October 8, 2007, Judge Carl J. West, one of the members of the Complex Panel of the Los Angeles Superior Court denied class certification in a case entitled *Handler v. Oppenheimer & Co., Inc.*, L.A. Superior Court No. BC343542, attached hereto as Exhibit A. On November 1, 2007, class certification was denied in *Bachrach v. Chase Investment Services Corp.*, Slip Copy 2007 WL 3244186 (D.N.J. 2007), a copy of which is attached hereto as Exhibit B. In yet another case, a proposed lead plaintiff lost on summary judgment. *Hein v. PNC Financial Services Group, Inc.*, 2007 U.S. Dist. LEXIS 44569 (E.D. Pennsylvania 2007), a copy of which is attached hereto as Exhibit C. A discussion of the risks inherent in this case would not be complete without noting two other things. First, the defendant is an extremely large and solvent entity that was capable of engaging in protracted litigation. Second, the defendant was represented by a very large and very experienced law firm that had not only extensive wage and hour experience, but experience in this very type of stockbroker litigation.

Turning to factors relating to the extent of discovery and when the settlement occurred, my first contact with our lead plaintiff, Linda Young, occurred in January of 2007. She had been employed as a Client Service Specialist at a Schwab branch in Reno, Nevada. Although I had never met her before, I had an account with Schwab in Reno for a number of years. At least for me, this proved extremely helpful because I had seen the physical layout many times and had actually observed the specialists at work. This helped me understand something of their typical duties. By the time the mediation actually occurred in San Francisco, plaintiffs' counsel had also received from defense counsel the type of information traditionally provided in wage and hour cases. This information included average compensation, number of employees broken down by state, number of work months, and amount of deductions. Based on my experience in settling literally dozens of these cases, and trying several of them, I knew that this information would allow plaintiffs' counsel to evaluate exposure by plugging in different assumed overtime work

hours and then adjusting for a risk factor based on our past experience in litigating wage and hour cases.

In terms of when the settlement was reached, it can be said that the agreement in principle was reached fairly early in the case. The national FLSA complaint was filed on May 31, 2007. On August 3, 2007 it was amended to add a California sub-class. Mediation occurred in November 2007 before David Rotman, and an agreement in principle was reached two weeks after that mediation session. However, ultimate formulation of the settlement agreement was somewhat delayed because of the allocation issue before (Ret.) Judge Legge and the usual details that arise during settlement drafting.

There was no governmental presence in this case; however, under the provisions of CAFA, counsel for Schwab mailed to the Attorney General and to all appropriate state representatives the Notice of Settlement and other required information. No federal or state representatives have responded.

With respect to the experience and views of counsel, the McInerney Declaration and the accompanying Declaration of James F. Clapp discuss in considerable detail our collective experience in complex wage and hour litigation, and, in particular, experience that we have gained in the area of stockbroker overtime claims. On the other side of the case, Seyfarth Shaw, LLP is a preeminent national firm specializing in labor and employment law. Plaintiffs' counsel are requesting that this proposed settlement be granted final approval.

Lastly, and certainly of great consequence, are the factors of the amount offered in the settlement and the reaction of class members to the proposed settlement. In this case the net settlement amount is to be divided between two types of claimants. For those employed by Schwab after October 1, 2005 (when the company reclassified these employees to non-exempt status), persons who submitted a timely claim form will receive an equal share of a $275,000 sub-fund.[3] At the time of preliminary approval, it was Class Counsel's estimate, based upon the potential exposure of the defendant and what would happen if the case were tried through some

[3] As of July 10, 2008, there were 315 claimants which would translate to approximately $850 per claimant.

random statistical sampling methodology, that the net amounts received through the settlement would be approximately one third of the realistic net that class members might receive after trial. The undersigned has tried several cases and prepared others for trial using random statistical sampling. In those cases I have sat with the class members who have been randomly selected when their depositions were taken prior to trial. I have learned from my experience in these cases and from my experience in having spoken to more than a thousand stockbrokers over the past two and a half years that we would have something of a mixed bag. By the time the results were extrapolated out to the class, some rough form of justice would be achieved, but some class members would be perhaps undercompensated and others would be overcompensated and all would still be facing the risk of appellate review.

When the undersigned did this rough calculation, I was using the figures that were contained in the draft of the notice advising California class members that they could expect to receive a minimum of $50.00 net for every month worked during the class period prior to reclassification and approximately $25.00 net per month for those employed outside of California. However, not all eligible class members have chosen to submit claims. Indeed, as of this date, something less than half of the eligible members submitted claims and their claims amounted to approximately 61% of the total eligible work months in the period prior to Schwab's reclassification to non-exempt on October 1, 2005.[4] In our instant case, because not everyone submitted a claim, the actual amounts received by those who did and were employed in California will be approximately $250 for every month worked prior to reclassification and, for those employed outside California, approximately $125. When one considers that the earnings of a sales assistant were far less than those of mainline brokers, and when one additionally considers that the instant case did not have the high deductions from compensation that have been seen in

[4] These rates of claim are within the range of what one would reasonably anticipate in this type of case. In fact, they closely mirror the claim rates in *Burns v. Merrill Lynch*, Case No. C-04 4135 (MMC), which was granted final approval two years ago by Judge Chesney in the Northern District. That was the first of the stock broker cases. In that case, 48% of the eligible class members submitted claim forms, accounting for approximately 62% of the total months worked. The Schwab case is the first class action involving broker assistants.

the other broker actions, the instant proposed settlement compares very favorably with settlements achieved to date in broker cases:

**MONTHLY RECOVERIES**

| Case | California | Non-California |
|---|---|---|
| Charles Schwab & Co., Inc. | $250 (est.)* | $125 (est.)* |
| Karim v. BAIS | $285 | $142 |
| Merrill Lynch | $259 | N/A |
| Morgan Stanley | $219 | N/A |
| UBS | $375 | $75-$120** |
| Citigroup | $386 | $77-$130** |
| A.G. Edwards & Sons | $275 | N/A |

*The claims period does not close until July 31, 2008.
**Amount recoverable varied depending on the state of employment and that state's wage deduction laws.

During the class notice period I spoke to close to a number of current and former Schwab specialists. These individuals contacted my office for a variety of reasons. Some wanted a clarification of the notice. Others had questions about possible retaliation. One had existing litigation pending with Schwab. None of the individuals with whom I spoke was in any way critical of the proposed settlement. The fact that no objections were received and the exclusion rate was extremely low would indicate that the settlement has been well received. The members of this class are fairly sophisticated individuals who are certainly capable of expressing any dissatisfaction that they might feel.

\\\

\\\

\\\

\\\

## V. CONCLUSION

For the foregoing reasons, the Class Representatives and Class Counsel respectfully request that the Court grant final approval of the Settlement.

Dated: July 17, 2008

Respectfully submitted,

MCINERNEY & JONES

By: /s/ Kevin J. McInerney
Kevin J. McInerney
Attorneys for Plaintiffs