James F. Clapp, Esq., SBN 145814
DOSTART CLAPP GORDON & COVENEY
4370 La Jolla Village Drive, Suite 970
San Diego, CA 92122
Telephone:    (858) 623-4200
Facsimile:    (858) 623-4299
jclapp@sdlaw.com

Kevin J. McInerney, Esq., SBN 46941
Charles A. Jones, Esq., SBN 224915
MCINERNEY & JONES
18124 Wedge Parkway #503
Reno, NV 89511
Telephone:    (775) 849-3811
Facsimile:    (775) 849-3866
kevin@mcinerneylaw.net
kelly@mcinerneylaw.net
caj@mcinerneylaw.net

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LINDA YOUNG, MIKE SAFAIE,** and **JANICE KEVARI,** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**CHARLES SCHWAB & CO., INC.**<br><br>Defendant. | Case No. C 07:2828 CW<br><br>**DECLARATION OF KEVIN J. MCINERNEY IN SUPPORT OF: MOTION FOR FINAL APPROVAL OF SETTLEMENT; CLASS COUNSEL'S FEE AND COSTS APPLICATION; AND ENHANCEMENT AWARDS FOR THE NAMED PLAINTIFFS**<br><br>Date:       August 21, 2008<br>Time:       2:00 p.m.<br>Place:      Courtroom 2<br>Judge:     Hon. Claudia Wilken |

1

**TABLE OF CONTENTS**

2

3      I.      Qualifications of Class Counsel……………..…………......... 1

4      II.     The Instant Settlement Involving
5              Schwab is Distinct…………………………………………… 5

6      III.    Rule 23 Requirements………………………………………5

7      IV.     *Hanlon* Factors for Approval………………………………6

8      V.      Fee and Cost Requests………………………………….... 13

9      VI.     Requested Enhancement for Plaintiffs
10             Linda Young, Mike Safaie, and Janice Kevari…………… 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Kevin J. McInerney, declare as follows:

2

3    1.    I make this declaration in support of several requests:

4              1) The joint request of the parties that this Court grant final approval to the

5              proposed settlement;

6              2) Class counsels' application for an award of fees and costs; and

7              3) The request by class counsel that this Court award additional

8              enhancement payments to the individuals who have served as class

9              representatives in this action.

10          Unless otherwise indicated, the recitals in this declaration are personally known to

11   me and, if called upon to do so, I can and will testify in this Court to those recitals.

12

13                                          **I.**
                            **QUALIFICATIONS OF CLASS COUNSEL**

14

15   2.    By way of background, I am a 1967 graduate of Yale Law School. I was initially

16   admitted to practice in New York and served as an Assistant United States

17   Attorney in the Southern District of New York. I was admitted to the California

18   bar in 1970 after I transferred from the Southern District of New York to the

19   Southern District of California.

20

21   3.    I have considerable trial experience and have tried to judgment over three hundred

22   cases. I have also handled over fifty appeals in the Ninth Circuit, Second Circuit,

23   and in the California appellate courts.

24

25

26

27

28

---

CASE NO. C 07:2828 CW                    -2-            DECLARATION OF KEVIN J. MCINERNEY

4.   I left the United States Attorneys' office in the fall of 1988 and since that time my practice has been almost exclusively confined to class actions. Originally I handled mostly consumer class actions on behalf of plaintiff classes. Over the past eight years, however, that balance has shifted and the great majority of the cases I have worked on are wage and hour cases, also filed on behalf of plaintiff classes. I practice with my daughter, Kelly McInerney, and her husband, Charles Jones, and their practice is also restricted to class actions. I have actually tried a few class actions. These include the Pleasant Hill cases, which were tried in 1994 in the San Francisco Superior Court before Judge Carlos Bea, now of the Ninth Circuit. Later I arbitrated the Pep Boys overtime class action before the Honorable William F. McDonald, retired judge of the Orange County Superior Court. Most recently I tried and prevailed in the liability phase of the overtime class action involving insurance adjusters for Fireman's Fund. That was tried before Judge Lynn Duryee of the Marin County Superior Court. That case settled after the plaintiffs prevailed on the exemption issue at trial. In addition to these trials, I have taken four overtime cases to within a month of the actual commencement of trial, including one in the Denver District Court which settled on the morning of trial. I have handled over fifty overtime class actions over the past eight years and in many of those cases I have either been lead counsel or co-lead counsel.

5.   It is generally recognized that the past decade has seen a very high number of overtime class actions being prosecuted by private plaintiffs, especially in California. Four years ago the first class actions were filed on behalf of security brokers. These were filed by Jim Clapp of Dostart Clapp Gordon & Coveney LLP and Mark Thierman. My first involvement in this genre of cases came the following year when my firm filed several in the Southern District of New York. Among these was *Difrancesco v. Banc of America Investment Services, Inc.*, which was filed in November of that year.

6. Other broker cases in which I have been involved include *Glass v. UBS*, which settled and was granted final approval by Judge Maxine Chesney of the Northern District in January of 2007. That case involved claims for overtime and improper wage deductions on behalf of approximately 13,000 current and former stockbrokers employed by UBS in all jurisdictions other than California. There was a separate case brought on behalf of the California UBS brokers in which Jim Clapp was the lead plaintiffs' counsel.

7. I was lead counsel on another nationwide broker case, *Karim v. Banc of America Investment Services*. The Honorable Alicemarie Stotler of the Central District granted final approval of the settlement there just three months ago.

8. I have also served as one of the counsel in the *Citigroup (Smith Barney)* case. That case was granted final settlement approval by this Court on March 13, 2008. Jim Clapp served as co-lead counsel in that action.

9. I am also one of the attorneys involved in the *Morgan Stanley* nationwide settlement, which case is pending final approval before Judge Benitez of the Southern District of California.

10. I also served as one of the counsel in the overtime and deduction case against A.G. Edwards, in which case Judge John Houston of the Southern District of California wrote a lengthy opinion denying defendant's motions for summary judgment. *Takacs v. A.G. Edwards & Sons, Inc.* 444 F. Supp.2d 1100 (S.D. Cal. 2006). That case settled recently and Judge Houston granted final approval in December of last year. Although I participated actively in the case, Jim Clapp was the lead plaintiffs' attorney.

11.     My firm serves as co-counsel in several other broker cases that are in various stages of litigation. The defendants in those cases include: Prudential Securities, Wachovia Securities, First Union Securities, JP Morgan Chase, and Wells Fargo Securities. Through my involvement in the broker cases, I have become familiar with the motion practice involved in those actions and also with attempts by the parties to resolve them. In addition to the cases in which my firm appears, I am aware of the details of settlements in other broker cases because of my regular contact with plaintiff and defense counsel involved in those actions.

## II.
## THE INSTANT SETTLEMENT INVOLVING SCHWAB IS DISTINCT

12.     To my knowledge, our instant action involving Charles Schwab & Co., Inc. is the first class suit on behalf of "broker assistants." Earlier broker cases involved individuals whose primary duty was the sale of securities and financial instruments. Here the suit is on behalf of the Client Service Specialists (sales assistants) whose primary job is to support those mainline brokers and the branch. Typically these individuals are SEC licensed but are on salary and earn considerably less than mainline stockbrokers.

## III.
## RULE 23 REQUIREMENTS

13.     As this Court is aware, the proposed settlement in the instant case involves a total payout of $2.125 million by the defendant. I have been intimately involved with every aspect of this case since its filing in May 2007 and I urge that this Court grant final approval to our proposed settlement. Looking at the procedural requisites for class treatment, numerosity is obviously met because the number of putative class members is approximately 850. Commonality exists and

predominates because the central issue is whether or not these client assistants met the criteria for exemption from overtime protection. The claims of the class representatives were accordingly typical because they sought restitution in the form of overtime pay, the principal claim of the entire class. Adequacy of representation is met because no conflicts have arisen between the named plaintiffs and the class that they have sought to represent in the approximate 14 months that the case has been pending. Additionally, the named plaintiffs have retained a significant number of attorneys who have demonstrable experience in handling complex litigation. Although class members worked throughout the country, the relevant state wage laws have been carefully analyzed by plaintiff and defense counsel and our proposed settlement allocation has been reviewed by the Special Master, Judge Charles A. Legge (Ret.) Lastly, the superiority aspect is satisfied because there was really no viable alternative for resolving the claims of over 800 employees who worked in numerous jurisdictions throughout the United States. The settlement has been well received by the class as seen by the very small number of exclusions (twenty-one or 2.46%) and the complete absence of objections.

## IV.
### *HANLON* FACTORS FOR APPROVAL

14.    Turning to the factors that the Ninth Circuit requires district courts to balance in assessing a settlement proposal, the strength of the plaintiffs' case is the first factor. *Hanlon v. Chrysler Corporation* 150 F3d. 1011 (9th Cir. 1998). When the broker cases were first started nearly four years ago, the idea that security brokers were entitled to overtime struck most people as unusual to say the least. For nearly six decades stockbrokers had been treated as exempt and people simply assumed that they were exempt. Their challenge to exempt status was based on a

very sophisticated interplay of the regulations relating to exemptions for administrative employees. There was never any real issue that the brokerage employees routinely worked in excess of forty hours per week, although there were obviously differences between the work hours of individuals within a company and even some variations between brokers who worked for traditional wirehouses like Merrill Lynch, Smith Barney, and UBS and those who worked in-house for banks.

15.    It was certainly apparent to all counsel involved in this case that any decision could be appealed all the way up the appellate ladder so the likely duration factor favored settlement. Similarly, the expense of fully litigating a case like this would easily run into seven figures because of the number of potential depositions that would have to be taken all across the country of class representatives, class members, and supervisory and management personnel. The risk and complexity factors also favor settlement. One can get a feel for how complex the issues are in a case like this by simply glancing through Judge Houston's order denying summary judgment in one of these actions. *Takacs v. A.G. Edwards & Sons, Inc.* 444 F. Supp.2d 1100 (S.D. Cal. 2006).

16.    There was always a very real risk factor in the brokerage cases. Apart from their novelty, the attorneys who originally filed these cases were all extremely experienced wage and hour attorneys who also had very considerable class action experience. However, it was always discussed between us that, if the genre of litigation did prove successful, it would attract copycat suits and those might be filed by less skilled practitioners. A number of defense attorney likened our initial complaints to houses of cards. I prefer the minefield analogy, because if a plaintiffs' lawyer made a slight mischaracterization of the compensation schemes of the defendant or the duties performed, the plaintiffs' case would be blown away.

1   The other very real risk in the broker cases was that the US Department of Labor
2   could issue an adverse opinion letter. To say that the US Department of Labor is
3   political would be, in my opinion, a serious understatement. I had personally been
4   involved in the overtime class actions involving insurance adjusters and recall the
5   impact of the November 2002 Opinion Letter from the DOL supporting the
6   premise that insurance adjusters were administratively exempt. Apart from my
7   own opinion that the Opinion Letter was a political hatchet job which ignored
8   decades of judicial interpretation and precedent, it was resoundingly criticized by
9   the California Court of Appeals in *Bell v. Farmers Insurance Exchange* (2004) 115
10  Cal.App.4th 715, 733-35. Nonetheless, that Opinion Letter did gain some traction
11  with some courts and wound up being cited with approval by the Ninth Circuit in
12  *Miller v. Farmers Insurance Exchange*, 481 F.3d 1119, 1128-29 (9th Cir. 2007).
13  When the first broker overtime cases were being filed, plaintiffs' counsel knew
14  that the securities industry would press for a favorable opinion letter and probably
15  get it.

16

17  17.   There was always an appreciable risk with respect to obtaining class action status,
18        let alone maintaining it throughout trial. The defendant had plausible arguments
19        that its Client Service Specialists performed a wide range of duties and did not
20        approach their employment in lockstep. Plaintiffs' counsel certainly recognized
21        that there were differences in the amount of selling done by specialists and even by
22        the same specialists depending on their tenure. This made class certification an
23        interesting proposition. In hindsight we know that, more recently, at least two
24        broker cases have been denied class certification. On October 8, 2007, Judge Carl
25        J. West, one of the members of the Complex Panel of the Los Angeles Superior
26        Court denied class certification in a case entitled *Handler v. Oppenheimer & Co.,*
27        *Inc.*, L.A. Superior Court No. BC343542, attached hereto as Exhibit A. On
28        November 1, 2007, class certification was denied in *Bachrach v. Chase Investment*

1    *Services Corp.*, Slip Copy 2007 WL 3244186 (D.N.J. 2007), a copy of which is

2    attached hereto as Exhibit B.  In yet another case, a proposed lead plaintiff lost on

3    summary judgment.  *Hein v. PNC Financial Services Group, Inc.*,2007 U.S. Dist.

4    LEXIS 44569 (E.D. Pennsylvania 2007), a copy of which is attached hereto as

5    Exhibit C.  A discussion of the risks inherent in this case would not be complete

6    without noting two other things.  First, the defendant is an extremely large and

7    solvent entity that was capable of engaging in protracted litigation.  Second, the

8    defendant was represented by a very large and very experienced law firm that had

9    not only extensive wage and hour experience, but experience in this very type of

10   stockbroker litigation.

11

12   18.   Turning to factors relating to the extent of discovery and when the settlement

13         occurred, my first contact with our lead plaintiff, Linda Young, occurred in

14         January of 2007.  She had been employed as a Client Service Specialist at a

15         Schwab branch in Reno, Nevada.  Although I had never met her before, I had an

16         account with Schwab in Reno for a number of years.  At least for me, this proved

17         extremely helpful because I had seen the physical layout many times and had

18         actually observed the specialists at work.  This helped me understand something of

19         their typical duties.  By the time the mediation actually occurred in San Francisco,

20         plaintiffs' counsel had also received from defense counsel the type of information

21         traditionally provided in wage and hour cases.  This information included average

22         compensation, number of employees broken down by state, number of work

23         months, and amount of deductions.  Based on my experience in settling literally

24         dozens of these cases, and trying several of them, I knew that this information

25         would allow plaintiffs' counsel to evaluate exposure by plugging in different

26         assumed overtime work hours and then adjusting for a risk factor based on our past

27         experience in litigating wage and hour cases.

28

19.     In terms of when the settlement was reached, it can be said that the agreement in principle was reached fairly early in the case. The national FLSA complaint was filed on May 31, 2007. On August 3, 2007 it was amended to add a California sub-class. Mediation occurred in November 2007 before David Rotman, and an agreement in principle was reached two weeks after that mediation session. However, ultimate formulation of the settlement agreement was somewhat delayed because of the allocation issue before (Ret.) Judge Legge and the usual details that arise during settlement drafting.

20.     There was no governmental presence in this case, for which I was extremely grateful. The U.S. Department of Labor had been for the past six years overtly friendly to employers and hostile to employee rights. It has issued over a dozen opinion letters that have failed to respect earlier opinion letters and judicial precedent. It is interesting to note that, for example, the Opinion Letter issued in November of 2006 regarding the exempt status of stockbrokers studiously ignored the one reported decision that was favorable to stockbrokers and the one decision that everybody on the defense and plaintiffs' sides were talking about, notably Judge Houston's decision in *Takacs v. A.G. Edwards & Sons, Inc.*

21.     With respect to the experience and views of counsel, my declaration and the accompanying declaration of James F. Clapp discusses in considerable detail our collective experience in complex wage and hour litigation, and, in particular, experience that we have gained in the area of stockbroker overtime claims. On the other side of the case, Seyfarth Shaw, LLP is a preeminent national firm specializing in labor and employment law. Plaintiffs' counsel and Seyfarth Shaw are jointly requesting that this proposed settlement be granted final approval.

22.     Lastly, and certainly of great consequence, are the factors of the amount offered in the settlement and the reaction of class members to the proposed settlement. In this case the net settlement amount was to be divided between two types of claimants. For those employed by Schwab after October 1, 2005 (when the company reclassified these employees to non-exempt status), persons who submitted a timely claim form will receive an equal share of a $275,000 sub-fund.[1] At the time of preliminary approval, it was my estimate, based upon the potential exposure of the defendant and what would happen if the case were tried through some random statistical sampling methodology, that the net amounts received through the settlement would be approximately one third of the realistic net that class members might receive after trial. I have tried several cases and prepared others for trial using random statistical sampling. In those cases I have sat with the class members who have been randomly selected when their depositions were taken prior to trial. I have learned from my experience in these cases and from my experience in having spoken to more than a thousand stockbrokers over the past two and a half years that we would have something of a mixed bag. By the time the results were extrapolated out to the class, some rough form of justice would be achieved, but some class members would be perhaps undercompensated and others would be overcompensated and all would still be facing the risk of appellate review.

When I did this rough calculation, I was using the figures that were contained in the draft of the notice advising California class members that they could expect to receive a minimum of $50.00 net for every month worked during the class period prior to reclassification and approximately $25.00 net per month for those employed outside of California. However, not all eligible class members have

---

[1] As of July 10, 2008, there were 315 claimants which would translate to approximately $870 per claimant.

1  chosen to submit claims.  Indeed, as of this date, something less than half of the

2  eligible members submitted claims and their claims amounted to approximately

3  61% of the total eligible work months in the period prior to Schwab's

4  reclassification to non-exempt on October 1, 2005.  These rates of claim are within

5  the range of what one would reasonably anticipate in this type of case.  In fact,

6  they closely mirror the claim rates in *Burns v. Merrill Lynch*, Case No. C-04 4135

7  (MMC), which was granted final approval two years ago by Judge Chesney in the

8  Northern District.  In that case, 48% of the eligible class members submitted claim

9  forms, accounting for approximately 62% of the total months worked.  In our

10  instant case, because not everyone submitted a claim, the actual amounts received

11  by those who did and were employed in California will be approximately $250 for

12  every month worked prior to reclassification and, for those employed outside

13  California, approximately $125.  When one considers that the earnings of a sales

14  assistant were far less than those of mainline brokers, and when one additionally

15  considers that the instant case did not have the high deductions from compensation

16  that have been seen in the broker actions, the instant proposed settlement compares

17  very favorably with settlements achieved to date in broker cases:

**MONTHLY RECOVERIES**

| Case | California | Non-California |
|---|---|---|
| Charles Schwab & Co., Inc. | $250 (est.)* | $125 (est.)* |
| Karim v. BAIS | $285 | $142 |
| Merrill Lynch | $259 | N/A |
| Morgan Stanley | $219 | N/A |
| UBS | $375 | $75-$120** |
| Citigroup | $386 | $77-$130** |
| A.G. Edwards & Sons | $275 | N/A |

*The claims period does not close until July 31, 2008.
**Amount recoverable varied depending on the state of employment and that state's wage deduction laws.

23. During the class notice period I spoke to close to several current or former Schwab specialists. These individuals contacted my office for a variety of reasons. Some wanted a clarification of the notice. Others had questions about possible retaliation. One had existing litigation or arbitration pending with Schwab. None of the individuals with whom I spoke were in any way critical of the proposed settlement. The fact that no objections were received and the exclusion rate was extremely low would indicate to me that the settlement has been well received. After all, the members of this class are fairly sophisticated individuals who are certainly capable of expressing any dissatisfaction that they might feel.

## V.
## FEE AND COST REQUESTS

24. The same factors which I have addressed above support class counsel's application for attorney fees in the amount of $531,500, which equates to 25% of the total settlement. I am filing a separate Memorandum of Points and Authorities with respect to the award of attorney fees, although I appreciate that this Court is well versed in the law of the Ninth Circuit.

25. I am also submitting as Exhibit D to this declaration a listing of all the expenses incurred by this firm during the prosecution of this litigation, all of which I believe were reasonably incurred in furthering the interests of the class. I recognize that my firm will actually incur some further expenses and expend some additional time in the future if this settlement is granted approval in wrapping up the administration of the settlement, but I will not be submitting any further applications for compensation or reimbursement.

26. Along with my declaration, I also submit the Declaration of James F. Clapp, which addresses the experience of plaintiffs' co-counsel, the costs incurred by his office, and the contributions of his respective named plaintiffs.  Costs incurred by his firm can be summarized as follows:

| | |
|---|---|
| Travel | $1,858.32 |
| FedEx | $100.74 |
| Depos/Transcr. | $743.45 |
| Mediation Fees | $14,400.00 |
| Legal Research | $329.21 |
| Postage | $17.66 |
| Photocopies | $594.75 |
| Filing Fees | $488.00 |
| Facsimiles | $12.25 |
| Total | $18,544.38 |

**VI.**
**REQUESTED ENHANCEMENT FOR PLAINTIFFS**
**LINDA YOUNG, MIKE SAFAIE, AND JANICE KEVARI**

27. In this case, three individuals came forward to serve as Class Representatives.  The first was Linda Young, who had been a Client Service Specialist with Schwab in Reno, Nevada.  She was referred to McInerney & Jones by a local attorney with whom she had consulted.  We had numerous meetings with Ms. Young to gain background on her claims and those of other potential class members.  After the complaint was filed in May of 2007, Schwab made a settlement offer to Ms. Young to settle out her claim.  Although the undersigned has been involved in well over eighty class actions over the past two decades, I believe this is the first time that this has ever occurred.  It was apparent to the undersigned that Ms. Young was in difficult economic times and I had to advise her that she could accept this offer.  Although I advised her that it was more than a court would likely award, she told me that she wished to pursue the matter on behalf of the class.  Certainly this is a concrete example of what some class representatives really do on behalf of others.  Ms. Young has been attentive to the progress of the lawsuit and we have talked on

1     an almost monthly basis about its progress.

2

3     28.     Shortly after the initial complaint was filed, I was contacted by Mike Safaie, who

4             had been a Client Service Specialist in the Los Angeles area.  He expressed an

5             interest in the litigation and the potential benefits of adding him as a named

6             plaintiff for a California sub-class were readily apparent.  I had two meetings with

7             Mr. Safaie in the Los Angeles area and went over with him the duties he

8             performed for Schwab and those of other broker assistants with whom he was

9             familiar.  He too has remained attentive to the lawsuit and I have spoken with him

10            telephonically on numerous occasions.  Specifically, I discussed with him the

11            efforts at mediation and the proposed Settlement and its terms before the

12            Settlement Agreement was reached.

13

14    29.     Janice Kevari was initially a client of the law offices of Scott Cole, Esq.  She was a

15            former Client Service Specialist with Schwab in the San Diego area.  In

16            approximately September 2007, an action on her behalf and others similarly

17            situated was filed by Scott Cole in the San Francisco Superior Court alleging

18            violations of the California Labor Code.  After learning of this filing, my co-

19            counsel, Jim Clapp, and I spoke with Scott Cole and suggested that he dismiss his

20            later filed action.  We advised him that we would interview Janice Kevari and if

21            she appeared to be an adequate class representative we would include her as a

22            named plaintiff.  Mr. Cole agreed to this and Jim Clapp met Ms. Kevari at his

23            offices in San Diego.  It appeared to us that she was, indeed, a good class

24            representative and she has served in that capacity over the past eight months.  Like

25            Linda Young and Mike Safaie, she provided us with good insight into the actual

26            duties performed by class members and the working conditions at Schwab.  She

27            too has remained very attentive to the progress in this case and served as a good

28            sounding board on various issues that have arisen.

30.     Under the terms of the Settlement Agreement, Schwab has agreed not to oppose any additional enhancements not to exceed $15,000 per representative. Each of these representatives could have filed an individual action and probably would have received far in excess of $15,000 for overtime worked; however, they chose to subordinate their individual rights to benefit a large class. As explained in the accompanying Points and Authorities, each undertook certain risks including a liability for costs of suit and even potentially attorney's fees. It goes without saying that but for the services of these representatives there would have been no class and no class recovery. It is therefore requested that the Court award each of these three named plaintiffs the sum of $15,000 as an enhancement payment.

I declare under penalty of perjury under the laws of the United States and of California that the foregoing is true and correct. This declaration is executed at Reno, Nevada on the 17th day of July, 2008.

          /s/ Kevin J. McInerney
          Kevin J. McInerney, Esq.