# EXHIBIT C

# EXHIBIT C

Case 4:07-cv-02828-CW    Document 49-4    Filed 07/17/2008    Page 2 of 10

Page 1
2007 U.S. Dist. LEXIS 44569, *

1052F6

WOLFGANG HEIN, Plaintiff v. THE PNC FINANCIAL SERVICES GROUP, INC. and PNC INVESTMENTS, LLC, Defendants.

CIVIL ACTION NO. 06-2713

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2007 U.S. Dist. LEXIS 44569*

**June 20, 2007, Decided**
**June 20, 2007, Filed**

**COUNSEL:** [*1] For WOLFGANG HEIN, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, Plaintiff: DANIEL A. OSBORN, LEAD ATTORNEY, BEATIE & OSBORN LLP, NEW YORK, NY; JOE H. TUCKER, JR., LEAD ATTORNEY, YVONNE Y. BARNES, BOOTH & TUCKER LLP, PHILADELPHIA, PA.

For THE PNC FINANCIAL SERVICES GROUP, INC., PNC INVESTMENTS, Defendants: MICHAEL J. OSSIP, MORGAN LEWIS & BOCKIUS LLP, PHILADELPHIA, PA.

**JUDGES:** Paul S. Diamond, J.

**OPINION BY:** Paul S. Diamond

**OPINION:**

### MEMORANDUM

Plaintiff Wolfgang Hein served from 2002 through 2004 as a securities broker at PNC, where his annual income averaged over $ 100,000. He brings this "collective action" under the Fair Labor Standards Act, contending that he and all current and former PNC securities brokers are entitled to overtime pay because PNC required them to work more than forty hours a week. *29 U.S.C. § 201 et seq.* PNC moves for summary judgment, arguing that Mr. Hein is exempt from the FLSA's overtime requirements. See *29 U.S.C. § 213(a)(1)*. The Department of Labor regulations by which the FLSA is implemented draw a clear distinction between highly paid, highly trained investment advisors engaged in sophisticated [*2] sales work -- who are not entitled to overtime pay under the FLSA -- and lower paid employees engaged in selling simple, basic products -- who are. Construing the record facts most favorably to Plaintiff, it is apparent that under these regulations, he is not entitled to overtime pay. Accordingly, I grant summary judgment in Defendants' favor.

### LEGAL STANDARDS

Upon motion of any party, summary judgment is appropriate "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The moving party must initially show the absence of any genuine issues of material fact. See *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. An issue is material only if it could affect the result of the suit under governing law. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In deciding whether to grant summary judgment, the district court "must view the facts in the light most favorable to the non-moving party," and take every reasonable inference in that party's favor. *Hugh v. Butler County Family YMCA, 418 F.3d 265 (3d Cir. 2005)*. [*3] If, after viewing all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. See *Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987)*.

The opposing party must support each essential element with concrete evidence in the record. See *Celotex, 477 U.S. at 322-23*. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004)* (restating *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976))*.

### BACKGROUND

In describing the background of this case, I have set out those record facts that are undisputed, and construed them in the light most favorable to Plaintiff. I have disre-

garded those factual allegations that Plaintiff makes without any evidentiary support. See *Celotex*, 477 U.S. at 322-23; *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000) [*4] (requiring more than "unsupported allegations" to defeat summary judgment). I have accepted as true all other factual allegations made by Plaintiff and construed them in the light most favorable to him.

### Mr. Hein's Qualifications and His Decision to Work for PNC

Plaintiff worked for PNC as a Senior Financial Consultant from November 2002 until February 2004. *Complaint at P 9*; *Hein Dep. of November 1, 2006 at 69-70*. During that time, Mr. Hein held the following professional licenses: Series 7 (general securities representative), Series 63 (state license), Series 24 (principal's license for supervising Series 7 registered representatives), and licensed insurance agent (enabling the holder to sell certain insurance products). *Hein Dep. of November 1, 2006 at 23-25*. He apparently also held a Series 65 license (managed money). *Hein Dep. of November 1, 2006 at 25*.

Mr. Hein sought a position at PNC in response to an advertisement that described PNC as a "premier brokerage firm with a sales culture based on client needs rather than product-oriented selling." PNC sought brokers with three to five years of "revenue-generating sales experience." *Osborn Decl. of March 5, 2007, Exhibit* [*5] *A*; *Hein Dep. of November 1, 2006 at 176*. Before joining PNC, Mr. Hein had worked in the financial industry for approximately twenty years. *Hein Dep. of November 1, 2006 at 18-69*. He had worked as a financial consultant for at least two companies: HGSE Commodities and Janney Montgomery Scott. *Hein Dep. of November 1, 2006 at 18, 48*. He had worked as a sales and revenue "producer" for at least three companies: Shearson Lehman Brothers, D.H. Blair, and M.S. Farrell, where he was a founding partner. *Hein Dep. of November 1, 2006 at 26, 30, 36*. Both as a financial consultant and as a producer, Mr. Hein "cold-called" potential clients, researched investment vehicles, advised clients about appropriate investments, and was paid a commission on his sales to clients. *Hein Dep. of November 1, 2006 at 47, 52-53, 68*. He did not receive overtime pay in any of these positions. *Hein Dep. of November 1, 2006 at 26*.

### Mr. Hein's Duties

Mr. Hein's duties at PNC were similar to those at his previous jobs. *HeinDep. of November 1, 2006 at 71-73*. As a PNC Senior Financial Consultant, Mr. Hein managed 200 client accounts worth an aggregate of approximately $ 25,000,000 [*6] to $ 30,000,000. *Hein Dep. of November 1, 2006 at 171*. Most of Mr. Hein's clients were existing PNC customers, although he brought forty to fifty clients with him from his previous employment. *Hein Dep. of November 1, 2006 at 171*. He received commissions on his sales of investment products, with a guaranteed bi-weekly draw of nearly $ 1,400 for the first three months of his employment at PNC, and a monthly draw of $ 2,000 after that. *Hein Dep. of November 1, 2006 at 103-104, 107*. Thus, although his monthly income varied with his sales revenues, it was never less than $ 2,000. In 2003 and 2004, PNC's Senior Financial Consultants had average annual incomes of over $ 100,000. *Gamache Decl. of February 14, 2007 at P 8*.

Mr. Hein sold myriad financial instruments, including securities, stocks, bonds, mutual funds, variable annuities, fixed annuities, life insurance, and long-term care insurance. *Hein Dep. of January 31, 2007 at 217-223*. He directly processed most of these transactions either by telephone or computer. He filled out forms for certain annuities and insurance products, which were processed by another person. *Hein Dep. of January 31, 2007 at 218-223*. [*7] Mr. Hein researched and sold products from an approved list provided by PNC. *Hein Dep. of November 1, 2006 at 89-91*. Very few of these products were actually owned by PNC. *Hein Decl. of March 5, 2007 at P 19*. Mr. Hein's sales portfolio was limited to sophisticated investment instruments. Thus, he did not sell checking or savings accounts, money market accounts, certificates of deposit, PNC loans, or lines of credit. *Hein Dep. of January 31, 2007 at 212-213*.

Mr. Hein's supervision was mimimal: he had a manager, whom he saw no more than twice a month at evening group meetings, where the manager discussed issues common to the thirty or forty SFCs and brokers in attendance. *Hein Dep. of January 31, 2007 at 246-248*. Mr. Hein met with his manager individually only a "handful" of times after his initial week-long orientation. *Hein Dep. of January 31, 2007 at 246-247, 252*. He communicated with the manager by phone or email five to eight times a month. *Hein Dep. of January 31, 2007 at 248-249*. The manager did not observe Mr. Hein's meetings with clients, listen to Mr. Hein's phone conversations with clients, monitor Mr. Hein's job performance, or actively train Mr. [*8] Hein. *Hein Dep. of January 31, 2007 at 251-253*. Mr. Hein may have sent his manager activity reports that Mr. Hein occasionally prepared on his own initiative for his personal use. *Hein Dep. of January 31, 2007 at 254-256*.

### Mr. Hein's Supervisory Responsibilities

PNC also employed Licensed Financial Sales Consultants, who are subordinate to SFCs: LFSCs sell credit cards, checking accounts, money market accounts, certificates of deposit, and other day-to-day bank services to PNC's customers. *Hein Dep. of November 1, 2006 at 95*; *Hein Dep. of January 31, 2007 at 213*; *Gamache Dep. of*

*January 31, 2007 at 39*. LFSCs hold a Series 6 license, which is more limited than Mr. Hein's licenses. *Hein Dep. of November 1, 2006 at 95*. LFSCs "cold-call" prospective clients, sell money market accounts and certificates of deposit, and have authority to invest clients' money in amounts up to $ 25,000 for mutual funds and $ 25,000 to $ 50,000 for fixed annuities. *Hein Dep. of January 31, 2007 at 208, 239-240; Hein Dep. of November 1, 2006 at 96*. LFSCs are required to refer clients wishing to invest greater amounts to an SFC. *Hein Dep. of January 31, 2007 at 240; Hein* [*9] *Dep. of November 1, 2006 at 96*. Generally, LFSCs target the "mass market" -- individuals with less than $ 100,000 in investable assets; SFCs target clients with more than $ 100,000 in investable assets. *Gamache Dep. of January 31, 2007 at 46-47*. Because of the unsophisticated nature of the products they sell, LFSCs, unlike SFCs, do not extensively investigate their clients' financial circumstances. *Cattie Decl. of February 14, 2007 at P 7*. In addition to their base salaries, they receive small incentive payments for their sales of financial products and referrals of clients to SFCs. *Hein Dep. of January 31, 2007 at 242; Gamache Decl. of February 14, 2007 at P 15*. LFSCs are regular, salaried PNC employees, and earn less than half the income of SFCs: approximately $ 40,000 to $ 50,000 a year. *Gamache Dep. of January 31, 2007 at 39; Gamache Decl. of February 14, 2007 at P 15*. PNC classifies LFSCs as non-exempt workers under the FLSA and pays them overtime. *Gamache Decl. of February 14, 2007, at P 10*.

During the course of his employment with PNC, Mr. Hein was based at three PNC branch offices and two PNC grocery store facilities. *Hein Dep. of January 31, 2007 at* [*10] *201*. Each branch office had, in addition to an SFC (Mr. Hein), a branch manager, an LFSC, and several bank tellers. *Hein Dep. of January 31, 2007 at 202-204*. The grocery store facilities had an SFC, tellers, and a supervisor of some sort, but no LFSCs. *Hein Dep. of January 31, 2007 at 224-225*.

Mr. Hein supervised at least three LFSCs -- one in each branch office. *Hein Dep. of January 31, 2007 at 227*. He reviewed their investment advice to clients, trained them in sales skills, and taught them how to assess customers' finances and investment goals. *Hein Dep. of November 1, 2006 at 97-98, Hein Dep. of January 31, 2007 at 228*. Along with regional managers, Mr. Hein also monitored bi-weekly "call nights," when LFSCs gathered in one location to call prospective customers. *Hein Dep. of November 1, 2006 at 97-98, Hein Dep. of January 31, 2007 at 228-230*. During these call sessions, LFSCs focused strictly on calling prospective clients, selected from a list of names furnished by PNC. *Hein Dep. of January 31, 2007 at 233-234*. Mr. Hein also made calls at these times to supplement his income and generate new investor leads. He chose to make these calls, however; [*11] PNC required Mr. Hein's attendance at call night solely to supervise the LFSCs. *Hein Dep. of January 31, 2007 at 234-236*.

**Mr. Hein's Communications With His Clients**

Aside from after-hours regional meetings and call nights, Mr. Hein spent approximately fifty percent of his time on the telephone. *Hein Dep. of November 1, 2006 at 87; Hein Dep. of January 31, 2007 at 271*. He would request his phone list from PNC either every week or every month. He also purchased customer lists from various list brokers. *Hein Dep. of January 31, 2007 at 281, 293*. Some of his calls did not result in contact with the "targeted" client, either because no one answered the phone, or because the person Mr. Hein was trying to reach was not available. *Hein Dep. of January 31, 2007 at 284-288*. Mr. Hein did not leave voicemails because the targeted clients rarely returned his calls. *Hein Dep. of January 31, 2007 at 284*. If another person in the household answered the phone, Mr. Hein inquired when the targeted client might be available and called again another time. *Hein Dep. of January 31, 2007 at 288*.

Mr. Hein usually reached his targeted clients. *Hein Dep. of January 31, 2007 at* [*12] *303*. He introduced himself and PNC, inquired about the client's financial goals and needs, asked about the client's assets and investments, and tried to persuade the client to come to the bank for a meeting. *Hein Dep. of January 31, 2007 at 294-295*. During the course of the call, he began to think about appropriate investment options, but made no recommendations until he had gathered as much information about the client as possible. *Hein Dep. of January 31, 2007 at 295*. He spent most of the call trying to learn about the client's financial situation and objectives. *Hein Dep. of January 31, 2007 at 299-300*. He never advised a client to buy or sell an investment on an initial call, as it would have been inappropriate to do so without knowing more about the client's resources and goals. *Hein Dep. of January 31, 2007 at 300*.

Mr. Hein spent approximately five percent of his telephone time "trading customers": he called clients whose investments had come due and discussed reinvesting in another instrument. *Hein Dep. of January 31, 2007 at 271-274*.

Mr. Hein spent the remaining fifty percent of his time meeting with clients, either at one of the bank branches or at [*13] the clients' homes or businesses. *Hein Dep. of November 1, 2006 at 87; Hein Dep. of January 31, 2007 at 271, 305*. During these meetings, which typically lasted between half an hour and two hours, he gathered information that would enable him to recommend suitable investments: the client's name, age,

Case 4:07-cv-02828-CW   Document 49-4   Filed 07/17/2008   Page 5 of 10

Page 4
2007 U.S. Dist. LEXIS 44569, *

occupation, income, marital status, children, risk tolerance, current investments, and investment goals. *Hein Dep. of January 31, 2007 at 296-297, 309-314, 317-318.* He completed required disclosure and application forms, which the client then signed. *Hein Dep. of January 31, 2007 at 306-309.* Using the information he had gathered by phone and during the meeting, Mr. Hein discussed with the client potential investments. *Hein Dep. of January 31, 2007 at 319.* Although Mr. Hein and the client often decided during their meeting whether to investor sell an instrument, nearly the entire meeting concerned information-gathering and decision-making rather than implementing the actual sale or investment. *Hein Dep. of January 31, 2007 at 320-321.* During subsequent meetings, Mr. Hein and the client had similar discussions, as Mr. Hein needed to update his files before he could [*14] make appropriate recommendations. *Hein Dep. of January 31, 2007 at 328-329.*

**The Overall Nature of Mr. Hein's Employment**

Thus, Mr. Hein engaged in six principal tasks: researching the performance of particular financial instruments; learning his clients' assets, holdings, and investment aims; recommending investments appropriate to the individual client; implementing actual transactions; generating new sales leads; and supervising the LFSCs. In carrying out these tasks, Mr. Hein had two goals: to make a recommendation that would best suit the client's needs, and to make a sale for PNC and a commission for himself. *Hein Dep. of January 31, 2007 at 276.* His compensation depended largely on his clients' actual sales or purchases. Mr. Hein testified that although both he and PNC profited from his sales, and regarded high sales volume as important and desirable, the most important thing he did was to advise the client on the best thing for the client. *Hein Dep. of January 31, 2007 at 276-279.* As an ethical consultant who worked for a reputable financial institution, he would have forgone a sale rather than recommend a course of action that was not in the client's [*15] best interest. *Hein Dep. of January 31, 2007 at 278-279.*

Mr. Hein did not participate in any traditional management activities, establish or implement corporate policy, formulate business plans, set wages, exercise hiring or firing authority, or make decisions that affected PNC as a whole. *Hein Decl. of March 5, 2007 at P 8; Hein Dep. of January 31, 2007 at 227.*

**DISCUSSION**

The Department of Labor regulations by which the FLSA is implemented set out in considerable detail the kinds of work and the kinds of workers protected by the Act and those exempt from its protections. See *29 C.F.R. § 541.0 et seq.* Applying these regulations to the facts I have just described makes plain that Mr. Hein is exempt from the FLSA's overtime pay requirements.

**I. The Fair Labor Standards Act**

Congress adopted the FLSA to protect workers from substandard wages and oppressive working hours. See *Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 226 (3d Cir. 1991).* The Third Circuit has thus observed that the FLSA's protections are intended primarily to benefit low-wage workers, as distinguished from managers or administrators, [*16] whom Congress exempted from coverage because they are less susceptible to employer abuse. See *Marshall v. Western Union Tel. Co., 621 F.2d 1246, 1250-1251 (3d Cir. 1980)* (FLSA addresses primarily minimum wages and maximum hours of "rank and file" employees). Accordingly, courts customarily have found low wage and rank and file positions subject to FLSA protection: computer technicians, *Martin v. Indiana Michigan Power Co., 381 F.3d 574 (6th Cir. 2004)*; electronics technicians, *Berg v. United States, 49 Fed. Cl. 459 (2001)*; immigration border patrol agents, *Adam v. United States, 26 Cl. Ct. 782 (1992)*; safety specialists or inspectors, *Zuber v. APC Natchiq, Inc., 144 Fed. Appx. 657 (9th Cir. 2005)*; and low-paid assistant managers in a fast food chain, *Donovan v. Burger King Corp., 675 F.2d 516 (2d Cir. 1982).*

The Act requires employers to pay overtime compensation to certain employees who work more than 40 hours a week. *29 U.S.C. § 207.* The Third Circuit and the Supreme Court have set out standards for determining whether an employee is exempt from this overtime [*17] pay requirement.

**II. Exemptions and Regulations -- General Standards**

Whether Plaintiff falls within an exemption is a mixed question of law and fact to be resolved by the Court. *Martin, 940 F.2d at 900.* In resolving this question, I must state "historical" or record facts, construed in the light most favorable to Plaintiff. *Martin, 940 F.2d at 900; Celotex, 477 U.S. at 322-23.* Next, I must draw from these historical facts inferences in Plaintiff's favor to apply the applicable Department regulations. *Martin, 940 F.2d at 900.* Plaintiff is not entitled, however, to unreasonable inferences or to inferences that have no record support. See, e.g. *GFL Advantage Fund, Ltd v. Colkitt, 272 F.3d 189, 210 (3d Cir. 2001)* ("a court is required to indulge only reasonable inferences"); *Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 (3d Cir. 1983)* (plaintiffs not entitled to inference where the record did not support plaintiffs' characterization of their activities). Finally, I must determine whether, given these facts and inferences, Plaintiff is exempt as a matter of [*18] law.

The Act's exemptions must be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 900 (3d Cir. 1991)* (quoting *Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960))*. The employer bears the burden of establishing that its employees come within the scope of an overtime exemption. E.g., *Davis v. Mountaire Farms, Inc., 453 F.3d 554, 556 (3d Cir. 2006)*.

The DOL has promulgated numerous regulations explaining and interpreting the FLSA, many of which Plaintiff asks me to ignore. Because these regulations "constitute the agency's 'body of experience and informed judgment' about the statute," however, I am required to give them "considerable" weight. *Martin, 940 F.2d at 900* (quoting *Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944))*.

### III. The Administrative Exemption

Consistent with Congressional intent, the Department has sought to exempt from the FLSA investment advisors in the [*19] financial services industry -- including those engaged in "sales" -- provided their sales activities are a function of their professional judgment respecting their clients' best interests:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

*29 C.F.R. § 541.203(b)*. This regulation is of a piece with the Department's decision to exempt from overtime pay requirements "any employee employed in a bona fide executive, administrative, or professional capacity":

> The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act [*20] shall mean any employee:
> 
> (1) Compensated on a salary or fee basis of not less than $ 455 per week ... exclusive of board, lodging or other facilities;
> 
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> 
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

*29 C.F.R. § 541.200(a) (2004)*.

It is undisputed that Plaintiff is an employee within the meaning of the Act, and that he satisfies the first prong of this test. PNC never paid him less than $ 455 a week: for the first three months of his employment with Defendants, Plaintiff received a bi-weekly draw of nearly $ 1,400, plus commissions. He subsequently received a monthly draw of $ 2,000, plus commissions. Plaintiff concedes that this compensation satisfies the first prong of the test. *Pl. Mem. in Opposition to Def.'s Renewed Mot. For S.J., at 6*.

The parties also do not dispute that Plaintiff satisfies the third prong of the test: that Plaintiff's primary duty included the exercise of [*21] discretion and independent judgment with respect to matters of significance. *Pl. Mem. in Opposition to Def.'s Renewed Mot. For S.J., at 6*. Plaintiff was a highly trained financial consultant who managed two hundred client accounts worth between $ 25,000,000 and $ 30,000,000. He balanced complex factors to tailor investment recommendations to his clients' needs. He had discretion to sell any of the hundreds of investment vehicles on PNC's approved list. He was not directly supervised, and his recommendations customarily were not reviewed. PNC presumed that he was exercising a high degree of judgment and care. *Hein Dep. of January 31, 2007 at 246-253*.

Plaintiff disputes only the second prong of the test: he denies that his primary duty was the performance of office or non-manual work directly related to the management or general business operations of Defendants or Defendants' customers.

### A. Directly related to management or general business operations

The DOL defines "directly related to ... management or general business operations" as "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on [*22] a manufacturing production line or selling a product in a retail or service establishment." *29 C.F.R. § 541.201(a)*. The Department explicitly lists finance as an example of work directly related to management or general business operations, and states that financial analysts are administratively exempt if they primarily perform the following tasks:

> collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing, or promoting the employer's financial products.

*29 C.F.R. § 541.203*. It is undisputed that these are exactly the tasks that Plaintiff performs. Accordingly, his work is "directly related to the management or general business operations of Defendants and Defendants' customers." *29 C.F.R. 541.200(a)(2)*.

**B. Primary duty**

In its regulations, the Department defines "primary duty" as:

> the principal, main, major or [*23] most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider ... include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*29 C.F.R. § 541.700(a)*.

The nature of Plaintiff's primary duty is a factual inference drawn from the undisputed historical facts. *Martin, 940 F.2d at 900*. The parties have not disputed Plaintiff's actual duties, only the characterization of those duties. *See Pl. Mem. in Opposition to Def.'s Renewed Mot. for S.J., at 9* ("While Mr. Hein does not contend that he did not engage in some [administrative tasks], he maintains that his primary duty was selling."). In determining whether the undisputed facts establish Plaintiff's [*24] primary duty, DOL regulations obligate me to consider at least the following four factors:

> (1) the relative importance of the exempt duties as compared with other types of duties;
> (2) the amount of time spent performing exempt work;
> (3) the employee's relative freedom from direct supervision; and
> (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*29 C.F.R. § 541.700(a)*.

Applying these factors to the undisputed facts confirms that Plaintiff's primary duty was FLSA exempt.

**Relative importance of exempt versus non-exempt duties**

As Plaintiff concedes, I must examine the importance of his duties in light of their value to PNC. E.g., *Dalheim v. KDFW-TV, 918 F.2d 1220, 1227 (5th Cir. 1990)*; *Pl. Mem. in Opposition to Def.'s Renewed Mot. For S.J., at 10*.

Gary Gamache, PNC's Senior Vice-President and Regional Sales Manager, testified without contradiction that the most important function of SFCs such as Plaintiff is "to give suitable financial advice to clients and prospective clients." *Gamache Decl. of February 14, 2007 at* [*25] *P 3*. Plaintiff himself confirmed Mr. Gamache's testimony when he acknowledged that although he sought to maximize his commissions, the most important thing he did was make appropriate recommendations to clients, even if he did not realize a sale as a result. *Hein Dep. of January 31, 2007 at 276-279*.

In these circumstances, the undisputed facts confirm that Plaintiff's exempt duties are more important to his employers than his non-exempt duties. See *Piscione v. Ernst & Young LLP, 171 F.3d 527 (7th Cir. 1999)*.

### Amount of time spent performing exempt work

Although the Department cautions that the amount of time spent performing exempt work is helpful but not determinative, employees who spend more than fifty percent of their time performing exempt work "will generally satisfy the primary duty requirement." *29 C.F.R. § 541.700(b)*. Yet, "employees who do not spend more than fifty percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." *29 C.F.R. § 541.700(b)*. Moreover, as the Fifth Circuit has held:

> [T]he [*26] employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks she may also perform, even if they consume more than half her time.

*Dalheim, 918 F.2d at 1227.*

In contending that he spent the majority of his time performing non-exempt sales work, Plaintiff simply mischaracterizes the undisputed evidence, and asks me to ignore or contravene unhelpful DOL regulations. He includes many of his exempt duties -- such as collecting and analyzing client information and recommending appropriate investments -- in his calculation of the time he spent on non-exempt sales work. He asserts that these functions should be included because "selling involves ... cultivating prospective buyers (or leads) in a market segment; conveying the features, advantages and benefits of a product or service to the lead; and closing the sale." *Pl. Mem. in Opposition to Def.'s Renewed Mot. For S.J., at 12*. Plaintiff thus ignores numerous DOL regulations to which I am required to defer. See *Martin, 940 F.2d at 900*. Under these regulations and the FLSA itself, there are exempt and non-exempt sales-related duties. [*27] For instance, "cultivating" and "conveying" sales activities are exempt. See *29 C.F.R. §§ 541.201(c), 541.203(b)*. "Closing the sale" is non-exempt. See *29 C.F.R. § 541.203(b)*.

Plaintiff testified that he spent approximately fifty percent of his time "cold-calling." Plaintiff also testified that during a significant number of those calls, he would elicit information about assets and investment goals from potential customers. *Hein Dep. of January 31, 2007 at 303*. Because such information gathering is an administrative activity under DOL regulations, a significant portion of these calls (Plaintiff was not more specific) is exempt work. Moreover, Plaintiff testified that he never advised a client to buy or sell an investment on an initial call, believing that this would be inappropriate without knowing more about the client's finances and goals. *Hein Dep. of January 31, 2007 at 300*. This again confirms that Plaintiff's "cold calls" included -- at the very least -- a substantial amount of FLSA exempt work.

Plaintiff testified that he spent about five percent of his time "trading customers": calling [*28] clients whose investments had come due to discuss reinvesting the money in other investment vehicles. *Hein Dep. of January 31, 2007 at 271-274*. These discussions, too, are exempt work.

Plaintiff testified that he spent fifty percent of his time meeting with clients. *Hein Dep. of November 1, 2006 at 87; Hein Dep. of January 31, 2007 at 271, 305*. Each such meeting lasted between half an hour and two hours. *Hein Dep. of January 31, 2007 at 296-297*. Plaintiff acknowledged that nearly the entire meeting was spent information-gathering and decision-making rather than implementing an actual sale or investment. *Hein Dep. of January 31, 2007 at 320-321*. Thus almost all the time Plaintiff spent meeting with clients (almost fifty percent of his work time) comprised exempt activities.

PNC required Plaintiff to attend call nights, so that he could supervise LFSCs. *Hein Dep. of January 31, 2007 at 233-236*. Although Plaintiff did not ascribe a percentage to this activity, it is entirely exempt work. Although Plaintiff often chose to "cold-call" prospective clients on these nights, PNC did not require this. *Hein Dep. of January 31, 2007 at 234-236*. In any event, the cold [*29] calls comprised a substantial amount of non-exempt work.

Finally, Plaintiff spent a small amount of time processing actual transactions -- a non-exempt sales activity -- and filling out paperwork. *Hein Dep. of January 31, 2007 at 306-309*.

It thus appears that, with these descriptions, Plaintiff has accounted for more than 100% of his work time -- an impossibility I am not obligated to accept. See *GFL Advantage Fund, 272 F.3d at 210* ("a court is required to indulge only reasonable inferences"); *Guthrie, 722 F.2d at 1145* (plaintiffs not entitled to inference where the record did not support plaintiffs' characterization of their activities). Construing Plaintiff's characterization of his work in the most favorable manner I can reasonably employ, it is apparent that Plaintiff spent more than half his work time on exempt activities. Perhaps this is why Plaintiff argues that "a mechanical calculation of the time spent performing exempt or non-exempt work is not appropriate" in determining his primary duty. *Pl. Mem. in Opposition to Def.'s Renewed Mot. For S.J., at 11*. In fact, the Department's regulations require me to do just that: consider, [*30] inter alia, the exempt/non-exempt breakdown in determining Plaintiff's primary duty. *29 C.F.R. § 541.700*.

**Relative freedom from direct supervision**

Once again, the facts are undisputed. Plaintiff exercised a high degree of independence and discretion. His manager did not directly supervise him or review his recommendations to clients. The manager did not observe Plaintiff's meetings with clients, listen to his phone conversations with clients, monitor his job performance, or actively train him. His manager actually saw Plaintiff only during monthly group meetings, which concerned issues related exclusively to SFCs as a group. Plaintiff and his manager communicated by phone or email no more than eight times a month. *Hein Dep. of 246-256.*

Significantly, Plaintiff himself supervised at least three Licensed Financial Sales Consultants. Plaintiff reviewed the appropriateness of the LFSCs' investment advice, trained them in sales skills, and showed them how to profile customers. He also monitored the LFSCs during bi-weekly call nights. *Hein Dep. of November 1, 2006 at 97-98; Hein Dep. of January 31, 2007 at 227, 228-230.*

**Relationship [*31] between employee's salary and wages paid to other employees for the kind of non-exempt work performed by the employee**

Finally, under *§ 541.700(a)* I must consider the relationship between Plaintiff's salary and the wages paid to other employees for similar kinds of non-exempt work. It is undisputed that, like SFCs, LSFCs "cold-call" prospective clients and sell financial services and products (albeit of a less sophisticated variety, such as credit cards, checking accounts, money market accounts, and certificates of deposit). Unlike SFCs, LSFCs do not extensively investigate their clients' financial circumstances or goals, handle large investments, or engage in sophisticated financial analysis. LFSCs -- who are regular salaried employees and also receive a small commission on their sales -- make approximately $ 40,000 to $ 50,000 a year. By contrast, SFCs (like Plaintiff) on average earn over $ 100,000 a year -- more than twice an LFSC's salary. *Gamache Decl. of February 14, 2007 at P 8.* PNC classifies LFSCs as non-exempt employees under the FLSA and pays them overtime. *Gamache Dep. of January 31, 2007 at 39; Gamache Decl. of February 14, 2007 at P 10, 15.*

**CONCLUSION [*32]**

In sum, Plaintiff's administrative exemption is "plain[] and unmistakeabl[e]." *Martin, 940 F. 2d at 900.* All four factors set out in *§ 541.700(a)* indicate that Plaintiff's primary duty is exempt: (1) his exempt activities were more important than his non-exempt activities; (2) he spent a majority of his time on exempt work; (3) he has minimal supervision; and (4) he is paid more than twice as much as the LFSCs he supervises. Further, under *§§ 541.201* and *541.203*, Plaintiff performs exempt work "directly related to management or general business operations." Deferring, as I must, to these regulations, the facts construed most favorably to Plaintiff show that, as a highly trained, licensed investment advisor earning approximately $ 100,000 a year, Plaintiff is exempt from FLSA overtime pay requirements.

**NATURE OF RELIEF**

Plaintiff filed this putative opt-in collective action under *Section 216(b)* of the FLSA, which provides:

> An action to recover ... liability ... may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party [*33] plaintiff to any action unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought.

Plaintiff's motion to certify a collective action and notify potential opt-in plaintiffs pends before me. Although the Third Circuit has not recently set out the distinctions between class actions under *Fed. R. Civ. P. 23* and collective actions filed under FLSA *§ 216(b)*, other courts have recently held that collective actions (unlike class actions) are not representative. Thus "a *§ 216(b)* plaintiff presents only a claim on the merits ... [and] has no claim that he is entitled to represent other plaintiffs," and dismissal of his individual claim moots the entire action. *Cameron-Grant v. Maxim Healthcare Services, Inc., 347 F.3d 1240, 1249 (11th Cir. 2003).* See also *Clougherty v. James Vernor Co., 187 F. 2d 288, 291 (6th Cir. 1951) (§ 216(b) suits are not true class actions); Pentland v. Dravo Corp., 152 F.2d 851, 853 (3d Cir. 1946) (same); O'Neal v. Kilbourne Med. Labs., Inc., 2007 U.S. Dist. LEXIS 22620, 2007 WL 956428, at * 7 (E. D. Ky. March 28, 2007)* [*34] (in a collective action, the plaintiff, whose individual claim was dismissed at summary judgment, could not show that she was similarly situated to other potential *§ 216(b)* plaintiffs); *Vogel v. American Kiosk Management, 371 F. Supp. 2d 122, 130 (D. Conn. 2005)* (citing *Cameron-Grant, 347 F.3d at 1249*).

Accordingly, my determination that Plaintiff is exempt from the FLSA's overtime protections resolves only his individual claim. Because the employment and circumstances of other PNC Senior Financial Consultants may differ, my resolution of Plaintiff's claim does not necessarily resolve the potential claims of these individuals.

For the foregoing reasons, the Motion for Summary Judgment by PNC Financial Services, Inc. and PNC Investments is **GRANTED**.

An appropriate Order follows.

/S **Paul S. Diamond, J.**

**ORDER**

AND NOW, this 20th day of June, 2007, upon consideration of Defendants' Renewed Motion for Summary Judgment (Doc. No. 31), Plaintiff's Response (Doc. No. 33), Defendants' Reply (Doc. No. 35), Plaintiff's Further Response (Doc. No. 38), and any related submissions, and for the reasons set forth in [*35] the accompanying Memorandum, it is hereby ORDERED that Defendants' Motion is **GRANTED**. Judgment is entered in favor of Defendants, The PNC Financial Services Group, Inc. and PNC Investments, and against Plaintiff, Wolfgang Hein.

It is further ORDERED that Plaintiff's Motion to Certify Class (Doc. No. 24) is **DENIED as MOOT**.

The Clerk's Office shall close this case for statistical purposes.

AND IT IS SO ORDERED.

/s **Paul S. Diamond, J.**